Good morning, Your Honors. With the Court's permission, if I could reserve five of my twenty minutes for rebuttal. Watch the clock. I'll try to help you on that. Thank you, Your Honor. This is an appeal by McKesson from the District Court's judgment dismissing its complaint, seeking to recover for itself and for the benefit of its long-term shareholders the losses that it suffered as the biggest victim of the accounting improprieties that McKesson discovered at HBOC shortly after McKesson's acquisition of all of the outstanding shares of HBOC from HBOC shareholders. According to the appellee's own statement of this case, they say, and it's at ER 3-4 and it's derived from their own complaint below, quote, they agreed to a merger at an exchange ratio that was materially unfair to McKesson shareholders in that it assumed the value of HBOC was materially overstated. This appeal, Your Honors, squarely presents the issue of whether McKesson and its innocent long-term shareholders will be forced to bear the economic consequences of the accounting improprieties at HBOC or whether the largest HBOC shareholders who unjustly profited by exchanging artificially inflated, essentially worthless, HBOC shares in the merger that the appellee fund itself asserts was procured by fraud. Would you agree that another way to put this is whether the shareholders of HBOC are at risk for their corporate action? I would say, Your Honor, that it's a zero-sum game and the HBOC shareholders' gain is the loss of McKesson and its shareholders, and the question, therefore, becomes whether a court of equity is going to leave the unjust enrichment funds, the direct proceeds of what the fund claims to be a criminal, fraudulent activity in the hands of the HBOC shareholders. And I might add, Your Honor, that at the same time that the fund and the other HBOC shareholders refused to disgorge the proceeds of the merger fraud, which went directly to them, they are themselves suing HBOC to recover damages from their own injury that they allegedly suffered by buying at inflated prices. Of course, in the merger, McKesson ended up owning HBOC, so that double dip hurts McKesson and its long-term shareholders a second time, Your Honor. So it's not that they're taking no action, but many of those same shareholders are actively suing HBOC, our wholly-owned subsidiary. Okay, let me tell you what my concerns are, and maybe you could address your argument to those. I think this is a very difficult case. It's an unusual situation, and I've been looking at the two or three cases cited. I think we could all slice hairs and, you know, this one goes this way and this one goes that way, but there's really not a lot out there to guide us. So where I come back to is I am concerned about shareholders, in principle, assuming liability for corporate action, which is probably no surprise to you. And what concerns me is if it's permitted here, and let's assume that there's no contract just for talking purposes, why wouldn't it then open up shareholders in principle to virtually every other kind of third-party or related-party lawsuit? Your Honor, I think this is a very specific circumstance that doesn't really get anyone into the horribles that the fund strains to create. This is not a situation where shares are exchanged over an anonymous stock exchange or a derivative injury, and I might note parenthetically that for dividends, there are statutory remedies both under Delaware and California law for a shareholder that receives an improper dividend payment is at risk statutorily to return that overpayment, and there are statutes both in Delaware and in California which provide that. So this is not that unusual. And here, what distinguishes this situation is the direct, if you will, connection between McKesson on the one side and the HBOC shareholders on the other side. In that sense, I would suggest to Your Honor that the way to look at it is that there's no special rule that a shareholder who receives these proceeds can invoke to prevent the return of what is a classic case of unjust enrichment. I would put it to you this way, Your Honor. If McKesson had been aware on January 11, 1999, which is the day before those shares were issued in exchange for the valueless stock that those shareholders returned, if McKesson had been aware of the accounting irregularities, or I should say correctly, improprieties, that merger would not have occurred. We plead that, and that must be accepted as true. So the HBOC shareholders would not have received those ill-gotten proceeds. The merger would not have happened. The merger did happen because... You know, that makes sense, but that's probably true in virtually every merger situation. Every defrauded company would stand up and say that in a merger situation, so this is not distinguished at all. Right. But what's different is, of course, McKesson did not know about that, so the question then comes, the day after the merger, how does one restore, if you will, McKesson to the status quo? Because McKesson and its own long-term shareholders, including pension funds, which have been longtime shareholders of McKesson, have been injured in this situation. Remind me again how long it was after the merger before these restatements occurred and... A few months.  And for that reason, you can't undo the merger. Of course, you would like to. You'd like to unscramble the eggs, but you just can't do that. Well, on that point, you've indicated that there's not a remedy in terms of a rescission, and yet I think at the end of your brief, you suggest that we permit you, even if you were to not to prevail here, we permit you the opportunity with leave to amend because you might assert a rescission claim, and I had to say I found those two principles colliding. Yes. I don't think that we would assert a claim for rescission, which would involve a return of the property, and I think this court in the Ambassador case, which came to my attention in trying to think up the kind of questions that would be of interest, this court identified what are called rescissory damages, and the case is found at 189 Fed Third, 1017. It's a 1999 decision, and it talks about if rescission is no longer possible, perhaps, perhaps because the plaintiff no longer owns the subject of the sale, the court may order its monetary equivalent. This remedy entitles the plaintiff to return of the consideration paid less any value received on the investment. Essentially, our unjust enrichment claim seeks exactly that in this situation. I would argue to your honor that this really is a classic case. It's no different than if somebody robs a bank and gives the proceeds to somebody, or you go to the ATM machine and the money starts streaming out. You're innocent, but you have to return the money, and because Why isn't this the case in virtually every merger where there's an alleged fraud, an alleged accounting fraud or impropriety? Why is this any different? I mean, I know it's a reverse triangular merger, but the principles are the same. The structure matters, your honor. The structure matters, so because of the structure where McKesson chose to do it as a reverse No, not insurance, your honor, but it's the fact of the structure where, let's call it the bad company acquires the good one, where in that case, the shareholders could sue directly under the 33 Act. In this case, McKesson is sitting here, the bad company. The structure means, and when you're dealing with a mega liability, there needs to be a reckoning here. There needs to be a reckoning, and if this court were to impose, and I would submit artificially an obstacle to the recovery directly from the recipient of the proceeds of the merger, you've got to trace the money. That is always a sound philosophy is to trace the money and look where it went, and we have only brought, and I would acknowledge it's not necessarily totally beneficence to be are only suing the large shareholders here who exchanged 20,000 shares or more. So the problem is that your principle, whatever principle we have doesn't apply just to large shareholders. It applies to shareholders, or do you know of a way to distinguish? Exchanging shareholders directly in a merger. Now, with this structure, because in some situations, the proceeds might be in a different form. For example, as we point out, when C&C acquired a company and its books had a problem, there were different actions available, but in this particular circumstance, the only remedy to get at the 64 percent, which was essentially issued by McKesson in exchange for basically nothing, counterfeit shares, went right to the hands of those shareholders, and the question remains, Your Honor, why after the merger would those shareholders be entitled to retain those proceeds when we would all agree if in advance of the merger, we would not have to go through with it? And none of the rationales or reasons, and that's why the police here are struggling so hard. They've abandoned the district court's rationale, which is unusual to say the least, because it suffers from two fatal defects, the first of which is that it requires a valid enforceable contract to be asserted as an affirmative defense, and the admissions of the fund here is that it's not a valid enforceable contract. I would submit it's a closer case to strike that defense than it is to sustain it as a matter of summary judgment. There's certainly questions of fact as to whether the merger agreement is a valid enforceable contract, and even if it was, Your Honor, even if it was, the fund has admitted repeatedly in its briefs that in order to act as a bar or preclusion, the contract has to be between both parties. They say that. I saw them, at least as I understood it, they were abandoning the merger agreement but resurrecting the proxy argument. Well, I would say not resurrecting, but inventing. Well, we won't label it, but anyway, they make a proxy argument. Let me ask you, in terms of unjust enrichment, what is the timing of when the unjust enrichment occurred, in your view? On January 12, 1999, because at that point, that was the date that the shares were issued to those shareholders. At that point. Exchange date. At the exchange date. At that time, we got a reissued stock predicated on an exchange ratio, it was based on business earnings, and that those earnings were embodied in the exchange ratio. Throughout their briefs, they make it sound, Your Honor, like somehow McKesson is trying to re-trade this deal or renegotiate a bad business deal. That's not what's going on here. By their own allegations, they contend that there was fraud here. And the proceeds of the fraud, nothing went to HBOC. Nothing. Not a thing. Let me ask you, if one were a shareholder of HBOC and McKesson didn't come through on the exchange date with the appropriate exchange ratio, for some reason, maybe the records were at variance or whatever. So there's a handful of shareholders who don't get what they believe is the exchange ratio under the merger agreement. What's their remedy against McKesson? The HBOC shareholders, presumably, would have a 33-act claim against McKesson. And in fact, the fund brought a 33-act claim out. Individual shareholders would have a fraud claim. They'd have a security violation. And so, of course, it was issued presumptive prospectus. They would have a claim. They wouldn't have a contract claim. In fact, the fund who's arguing, as Your Honor put it, to resurrect the contract claim never brought a contract claim. They did bring a 33-act claim, but it was dismissed. And it was in that context that the district judge said, you know, were they kidding? They're saying they weren't told the deal was too good. That's essentially what was at issue in that case. Another question I have is the, if we analyze this under the unjust enrichment factors, the two at issue here seem to be that there was no, allegedly, no unjust enrichment. And then also the question of whether there's another adequate remedy at law. If I understand your position, you're saying that the adequate remedy at law has to be vis-a-vis the shareholders. Yes. And they're arguing that the adequate remedy of law could be third parties, such as Bear Stearns, Arthur Anderson, or whomever. What is your best authority for the proposition that the shareholders need to be the target of the remedy at law prong? We would refer the court to the, I think it's the interstate cigar case, which we cite in our brief. It's an opinion of the Seventh Circuit Court of Appeals in 1991. And it cites a lot of Supreme Court law. And it says that the jurisdiction in equity attaches unless the legal remedy, both respect to the final relief and the motive obtaining it, is as efficient as the remedy which equity would afford. This case holds that, and it's well settled, the court says, that if the remedy at law be doubtful, the court of equity will not decline cognizance. And in that case. You know what? It didn't help me. Well, that case said that that was a case where property was seized by the government. And the argument was made, as it was here, to go elsewhere and to sue the supplier. And the court said you don't have to do that. And here, this is really, I would characterize this, and I think equity has to be practical. This really is a wild goose chase. The cases they cite would lead us. And they say this. They actually say this in their brief repeatedly, that we should sue HBOC. We own HBOC. That's like taking money from our left pocket and putting it in our right pocket. So then they say, well, sue who? Bear Stearns? That's the doubtful remedy. Because there are indemnification agreements. They're liable only on their opinion. That's why I characterize it as sort of legal affronts in Gaston. The proceeds went to the HBOC shareholders. Bear Stearns only got a fee for services. The remedy at law, I mean, the wrong, if there is one here, is in the financial statement. Yes. Or misstatement. Yes. And the parties that play out in that are the corporation, HBOC. Not available. Right. And the variety of typical third-party directors, officers, directors, and the third-party financial advisors, lawyers, and the whole cast. Right. And as a practical matter, you have a couple of senior officers under indictment, and they're not going to be paying billions of dollars. And so there really is no other effective remedy. How does this court judge that? I mean, we're not here to try to figure out policy limits on, you know, some stacked-up liability. So, in other words, that's not, it seems to me that it's pretty difficult for us to make that judgment. That's why you can't take our remedy away, Your Honor, based on those doubtful possibilities. That's what this interstate case says, going back to the Supreme Court cases, if it's doubtful. When do we find out that we don't have that remedy? When we lose in court five years from now? We need to, and it makes eminent sense to direct ourselves. Believe me. Do you need to find out the answer to that first? No. If we did, there would be a stacking of consecutive obstacles in the way. And by the time we got there, they'd be arguing some form of laches, Your Honor. It would be years. But as a practical matter, if you don't go after the proceeds of the merger, which was 60 percent of a multibillion-dollar corporation, people who are, you know, going to be paid by the Federal Protective Service aren't going to make us whole. People who got a fee for services to give an opinion on the fairness are not going to make us whole. You can take judicial notice that Arthur Anderson is not going to make us whole. Those are the kinds of supposed remedies. And I know of no law that makes us, and even Corpus Juris, as an authority, says it's clear that the adequate remedy has to be against the particular individual. This is not a case. Brass, you're running out of time, but I'll give you some time for rebuttal. Thank you. Because we're trying to understand the breadth of your arguments. Would you address the argument of the proxy statement as being a form of contract that would preclude unjust enrichment? I would love to address that because in the 70 years since the 1933 Act, we've not been able to find a single solitary case, and they certainly haven't cited one where a prospectus was made into a contract. It's a disclosure document. The prospectus itself specifically says, and it's on excerpt of Record 269, right in the prospectus, it says, quote, it included a copy of the merger agreement, and the shareholders were specifically instructed, quote, read the merger agreement as it, underscored in the original, is the document that governs the proposed merger. Now, that doesn't say vote. There's a contract here. Very sophisticated lawyers who draft these documents would know how to make an offer. This isn't an offer. It's a disclosure statement. This entire argument is predicated out of necessity. While they rushed to abandon the position they argued before the district court, they invented this new position, and it's at odds with an en banc decision in the Hocking case of this court, where the entire court of appeals held that even somebody without the authority to make a contract offer still constituted an offer for sale under the 33 Act, because the court said that Section 2.3, which defines offer, is different and broader than an offer in the contract sense. That's their entire argument. Before you conclude, if you were writing the summary sentence of our opinion, how would it read? There is no impediment to what is a classic unjust enrichment case brought by McKesson to obtain the improper proceeds of a transaction that the aptly funded self characterizes as fraudulent. It's a long sentence. Thank you. Thank you. I'm going to move this microphone back a little bit so I don't overwhelm you. That's okay. Good morning, Your Honors. Today, McKesson asked you to make history. No court has ever allowed a claim like the one you're being asked to approve in this case. McKesson is asking the court to apply a whole new theory of shareholder liability by misapplying ancient equitable principles to modern corporate securities transactions that are heavily regulated by Congress and the SEC. Counsel, is it your view, then, that the principles of equity do not apply in a shareholder situation? They do not apply where they are utilized to override established principles of corporate form and shareholder liability. I think that is the essence of the Dean Van Lines decision that the district court found so persuasive. I understand it's a Fifth Circuit decision and it's not binding, but the reason that the district court found Dean Van Lines so persuasive is because of its far-reaching implications that it would have on established principles of shareholder liability and corporate form. Well, let's talk about the Dean Van Lines. There are two aspects of that. I mean, every one of these cases is not this case. It all kind of boils down to. But in Dean Van Lines, the court said actually there was no unjust enrichment due to the timing because Caron or Caroline, however you pronounce it. Condine. Condine. Condine. Condine still had the obligation to reimburse the government so that there was no unjust enrichment. We don't quite have that situation here. In other words, they just said there was no unjust enrichment at that point, but there might be upon liquidation. I would agree that the analogy to the Dean Van Lines decision is not exactly perfect. The Dean Van Lines decision is not on all fours, and the district court didn't say it was on all fours. The district court thought that the policy implications that concerned the Fifth Circuit in Dean Van Lines were at here, and that is the reason that we think the Dean Van Lines decision is important because it returns you to the policy considerations, which when you step back and step back from whether there was an express contract and whether general principles of equity are applicable, even if you find there's no express contract and even if you find that general principles of equity may otherwise be applicable, applying an unjust enrichment claim in this situation is bad policy because of the mischief it would create to establish principles of shareholder liability in corporate form. You had laid out a couple of consequences of that in your brief, one of which they addressed, which is the dividend situation. You also laid out the circumstance of where you might have somebody selling into an inflated market and a shareholder might then be liable. Would that person have no other recovery in that situation? I think that if you endorse the theory of liability that is being presented here today, it will make tremendous mischief for the victims of corporate frauds who already have a tremendous uphill battle with the Reform Act and the high hurdles that this Court has put on shareholder claims. You will then have every corporate defendant asserting claims that the shareholders who purchased, who sold their shares in the open market were unjustly enriched, and these cases, which now take three or four years, will take six years. Tremendous mischief will be made by going down that road, and I think, again, that is what the district court has to do. As I said at the outset, I am concerned about the whole corporate veil and the corporate form, which was part of our discussion. The flip side of your argument is they're saying, how do we get our money back? And the only people who have money that they shouldn't, in their view, are the shareholders of HBOC. So, you know, there's the two sides to the equity here is where we end up. One thing I've learned in preparing for this argument is that for every equitable maxim that can be cited, there is an equal and opposite equitable maxim that can be cited. Yes, that's true. So I think you have to step back and ask, you know, what is really the effect here? You're asking the public shareholders of a corporation who are in no position to negotiate the merger terms, they are in no position to independently value their corporation, and you're asking, you're endorsing a policy that makes them the guarantors of the value of their corporation. Remind me how many shareholders there were. Over a million. Okay. Well, let's step back because we have to walk through each of the steps here to get even to your last argument. Let's take the easiest ones first. If there was a contract or if there were a contract, we would have an easy case. Have you abandoned, in effect, the argument adopted by the district court, which is the merger agreement as a document we should look at as a contract or subject matter thereof? We have not abandoned that argument. Have or have not? We have not abandoned that argument, Your Honor. And I do think that we don't have to get to these overarching principles, but they're worth bearing in mind as we approach these other points. We have not abandoned that argument. We said in our briefs that the district court was correct when it found that an express contract governed the subject matter, and that express contract could either be the merger agreement or the unilateral contract that was formed by the prospectus offer. I guess the question is, who are the parties to that contract, though? Well, I think the paracourt finance case that this court decided, and we submitted it in our 28-J letter, it's at 96F3rd 1151, is directly on point, Judge Rawlinson. In paracourt finance, the court affirmed an unjust dismissal of an unjust enrichment claim against GE Capital on the ground that the subject matter of the transaction was covered by the express contract in that case. It was a purchase agreement. Even though that contract in issue expressly disclaimed third-party rights and GE Capital was not a party to that contract. The one difference there is that the GE Capital was kind of inextricably bound up in the documents with these debentures, as I recall, because there were cross-references in the documents. So you had GE Capital kind of, if you will, kind of swept in. Here we basically have the shareholders out here. It says they're not third-party beneficiaries, but there's no other cross-referencing of their legal status, is there? I think there is. All right. I think it's very analogous to the situation in GE Capital. GE Capital was not a party to the purchase agreement, and it was not a party to the debenture, which was the document that was cross-referenced. But what the court said was these documents taken together comprehensively address the subrogation rights. Now, if you look at the merger agreement here, and let me just point your attention to some record sites. If you look at ER 32 to 36, which is the merger agreement at sections 2.1 and 2.2, those set out the rights of the shareholders in a very comprehensive way. For example, and Mr. Lerner made this point in his argument, the merger agreement says the prospectus is attached to this. I'm sorry, the prospectus says the merger agreement is attached to this as an exhibit. Read it. It says this to the HPOC shareholders. Read it. It governs your rights. What part of the record would you cite to indicate that the shareholders accepted those terms? I would cite to the prospectus itself, which is the offer that is made. ER 258, which is the prospectus at page 1. And where is the portion that reflects the acceptance? The acceptance is not a document in the record, but there's material in the record that supports it. McKesson argues it's SEC Rule 145. And if you could put that up, David. SEC Rule 145, which is tab 13 in the Appellee's Appendix of Authorities. SEC Rule 145 makes it clear that the HPO shareholders manifest their assent to McKesson's offer by voting for the merger and exchange, exchanging their shares. And what it says here, I'm sorry, 145. This is describing the term offer as defined by the securities list, correct? The point I'm putting up here is that it says that the offer occurs and the sale occurs when they're submitted to the stockholders, an agreement pursuant to which such stockholders are asked to elect, on the basis of a new investment decision, whether to accept or new or different security in exchange for their shares. Now let's put up SEC Release 5316. This next release, 5316, I think is a complete answer to your question, Judge Rawlinson. This is also in the record, tab 12 of the Appellant Supplemental Appendix of Authorities. This is the release that the SEC put out when it adopted Rule 145. The point of Rule 145 was to make it clear that an offer of sale occurs in a merger that involves a new investment decision. Now why is this important? Counsel, before we leave that then, is there an agreement only with those stockholders who vote in favor of the merger? No. And here's the reason, and it's something that is blinked right past in the appellant's brief. There is a six-week period that intervenes between the date that the offer is made and the closing of the merger. During that six-week period, every HPOC shareholder who did not want to participate in the exchange had the ability to sell their shares fully valued in the open market and essentially not participate in the merger. So your position is if a shareholder did not object, that shareholder becomes contractually bound? If a shareholder either votes for the merger or, let's say, votes against the merger or abstains from the merger, that shareholder then has a new investment decision to make, either to hold their shares and allow it to be exchanged in the merger or sell their shares into the open market. And it's black-letter law that in accepting a unilateral offer for a unilateral contract, any act or forbearance can constitute acceptance. And this is why SEC Release 5316 is so directly on point. Well, let me ask, do you know – I couldn't find any cases where a proxy or a prospectus has been the basis of a contract. I haven't – we haven't found any cases either way on that, Your Honor. I mean, it is a remarkable proposition because in the same way that you suggest that things would go to hell in a handbasket if we adopted their position, there would be fairly significant public policy and other consequences were we to kind of rewrite the securities laws where prospectus became an offer for a legal contract, wouldn't there? I mean – Excuse me. I don't think you're rewriting the securities laws. Both SEC Rule 145 and this release make it clear that this is exactly what the SEC and Congress determined was the appropriate treatment of a merger transaction. But we are not saying that a offer that is in a prospectus is an offer because it's in a prospectus. We agree that the legal definition of offer in the 33 Act can be broader than the common law definition of offer. But we're also saying that in this case, you see, for example, if there's cases like the Hockley case, which Mr. Lerner, Judge Lerner, cited to you, those kind of cases involve situations where let's say a magazine advertisement is put out advertising condos for investment. Okay. And those cases say – in those cases, the SEC brings an action saying that was an unregistered offer to sell a security. Okay. We're not saying a magazine article about selling condos – So under your theory then, essentially McKesson can sue the shareholders individually under the prospectus for a breach of contract, correct? If the shareholders breached their contract, I assume they could. But the problem with that is the HBO shareholders didn't do any representations. There would be a breach of contract action that lied, but there's no breach. The shareholders accepted by voting and exchanging. Would you – if we move past the contract, let's assume just for discussion purposes that there's no contract. So then we need to walk through the unjust enrichment. You make two arguments there on no unjust enrichment and then that the available remedy doesn't have to be against the shareholders, but can it be against third parties? On that last point, they cite some general statement in law for who has to be the target of the remedy at law. What do you think is the best authority for your position that it doesn't need to be the shareholders? Well, first of all, Delaware law is the best authority because that's what governs here. The Interstate Cigar case, which Mr. Lerner cited, is not Delaware law. The best case is I think – I mean, everybody cited a lot of California cases too. I agree. As I go back to my maxim, for every maxim there's an equal – But I think the Griffin dewatering case and the Chrysler versus Airtem cases, which are Delaware cases, and they're cited at our answering brief on page 34, are the best authorities on this point. They basically say that where you have a contract remedy, you cannot go behind the back door and avoid your contract remedy by suing a third party in equity. And there's two elements of Delaware law of unjust enrichment where McKesson fails here. The first element is they must show that the retention of the benefit was unjust. And under the Delaware cases, and again, it's Griffin dewatering and Chrysler versus Airtem, that means the person from whom the restitution is sought must have received something which he was not rightfully entitled to receive. And in this case, the HBO shareholders received nothing that they were not literally entitled to receive under the merger agreement. And under those two cases, I think they cannot satisfy that element of unjust enrichment. Well, the difficulty with that is that assumes that the transaction was fairly valued at the date given, so we're kind of running around the axle here. I don't think it does, Your Honor. In those cases, make it clear that, see, if McKesson wants to claim that the underlying contract is void, they have to seek rescission. They didn't do that. Three years have passed. Two years passed before they asserted this counterclaim. They cannot have their cake and eat it too. They cannot, on the one hand, say that you should treat the express contract as void, and then, on the other hand, say we will not restore the status quo ante. That cannot, you can't have it both ways. Your Honor, in the time that I have remaining, I'd just like to turn to leave to amend, because I think that the district court was correct in denying leave to amend. They asked for leave to amend on two bases, both of which would be futile. They say they want to leave to amend to allege an agency theory. That would be futile because there are no facts that McKesson can allege regarding agency, that the HVOC shareholders had any control over the corporation or that the corporation was a sham or any fact which would be different than any other public shareholder of any other company. So that agency theory would be futile. The other argument they made, which seemed to have been abandoned by Mr. Lerner, is they should have leave to amend to plead rescission, even though rescission is impossible. They say, well, Judge White said if we pled rescission. Well, he said it was not rescission. It was a substitute where rescission is impossible, but you would have rescissionary damages is the way he phrased it. Okay. Here's the, I think, very important point on that. Rescissionary damages are another species of equivalent remedy. Okay. If there is a claim that HVOC induced this contract by fraud, that claim must be brought against HVOC. If it is not brought against HVOC, you cannot bring a claim that the merger agreement was fraud against the innocent HVOC shareholders who exchanged their shares for value. The HVOC shareholders occupy the classic position of innocent third parties who in good faith exchange their shares for value without notice of the fraud. I refer you, Your Honor, to Section 17 of the Restatement of Restitution on this point. There's no dispute that the shares exchanged by the HVOC shareholders had intrinsic value. The dispute is that they were overvalued. Okay. So, under another equitable maxim, which I will assert, no claim for rescission lies against innocent third parties in such circumstances because the interest of the victim of the fraud bows to the claim of the innocent third party who gives value without notice of the fraud. But do you agree that, in principle, unjust enrichment isn't a fault-based theory? It isn't a fault-based theory. But every, if we go back to our first-year contracts and those things, the fundamental principle is if the person who receives the benefit is an innocent party who gave value without notice of the fraud, it's like the bona fide purchaser doctrine, it precludes an equitable remedy against that third party. And that is why their rescissory damage angle won't work. It's futile to allege that. I think my time's expired. Thank you very much, Your Honor. Thank you. We aid into your rebuttal time, so you may have approximately two minutes of rebuttal. Thank you very much, Your Honor. First, and I'll try to deal with this quickly and as precisely as I can. With respect to the Dean Van Lines, read closely, I think that case really supports our position here. I love about these cases. They support everybody. The proceeds, Your Honor, went directly to the subsidiary in that case. And at the beginning of the case, the court of appeals specifically said that the government was trying to circumvent the corporate veil in that case to get derivatively from the parent the increased value in the stock when the parent sold it. The overcharges went to the subsidiary. They admitted they couldn't pierce the corporate veil and were trying the unjust enrichment tactic to circumvent the veil. That's not the issue here. Follow the proceeds. Here was a swap. If the government had paid the proceeds directly to Dean Van Lines, not Condine, the subsidiary would have come out differently, Your Honor. That paradigm supports us clearly. With respect to the SEC release, Your Honor, I just want to take care of that quickly. Right in the enabling release, it says that the broad concept of sale, offer to sell, are broader than the commercial or common law meanings of such terms. That's right in the enabling rule. This was a policy decision which the SEC reached. It said as a matter of statutory construction in light of the remedial purposes of the act and the public policy which support registration in this case. That was a disclosure document. Prospectus is our disclosure document. Mr. Shulman acknowledged there hasn't been a case in the history of jurisprudence that's adopted his theory. He's attacking my theory as novel? Well, I guess I think both sides would agree there's never been a case. Well, there's never been a case that adopts your theory on all fours in terms of the suit against the shareholders. Well, it came close in the Dudley case. It was a certification decision, but they certainly certified a class to get back the stock, and it specifically said that this class of defendants would have to relinquish it if they prevailed on just enrichment. I would say that some of Your Honor's thoughts on this, I think, prove that in the context of a 12b-6 motion, not the trial of unjust enrichment where all these factors could be weighed on a full record. We should be entitled to proceed. This was a 12b-6 motion where the judge summarily sustained a covered-by-contract defense. That's kind of a different twist you're taking now. You're now saying that there's factual issues? I'm essentially saying what the judge did was they took a contract, a merger agreement. And as an affirmative defense, that's why all this argument about rescission, we pleaded and we referred the court to the Chrysler case and to the Ventura decision by the Eighth Circuit in Art 28. Did you offer a proposed amended complaint that would allege the various agency or other theories? No, we didn't. I didn't think I saw one. I just wanted to make sure. No, we did not. That certainly would be something that we could do, but we don't feel that's necessary because on the complaint that we have, we pled unjust enrichment. As the Eighth Circuit held, what they've come back with, Your Honor, they've come back with an affirmative defense covered by contract. That's their affirmative defense. It's covered by a contract. They have to show it's valid, it's enforceable, that they're the same parties. We have a right to introduce evidence of fraud in the inducement. We don't have to. We're not affirmatively attacking any contract. We're simply seeking unjust enrichment, and there is no impediment to that. The Ventura case is clear on that, as is the Chrysler case. If there's evidence of fraudulent inducement, it creates a factual issue, which is why the Southern District decision, which this Court relied on in ParaCore. Right. We're familiar with that. Okay. So I think your time has expired, and we have your point. On behalf of the Court, let me thank both parties. The briefing was excellent. Thank you, Your Honor. We also appreciate having all the authorities tabbed, indexed, marked, color-coded, everything else from both sides. I mean, I think both of you have essentially indicated that for each of the theories, there is not really anything precisely on point. We've been looking as well. But I'll give you one more opportunity. So if you have anything further to submit in the way of authorities, both sides would have ten days. You can submit the name of the case in a parenthetical. Does everybody know what a parenthetical is? Yes, Your Honor. It's not a legal argument. Thank you very much. But if there is anything that you can find that you can put in a two-page letter with solely citations and parentheticals, we welcome it. Thank you. Thank you very much, Your Honors. Thank you, Your Honor.
judges: Ferguson, McKeown, Rawlinson